UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANNE MARIE DIDIO,<br>     Plaintiff,<br><br>     v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br>     Defendant. | No. 3:17-cv-01536 (SRU) |

**RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS**

In this Social Security appeal, Anne Marie Didio ("Didio") moves to reverse the decision by the Social Security Administration ("SSA") denying her disability insurance benefits. The Commissioner of Social Security moves to affirm the decision. I find that the Administrative Law Judge ("ALJ") did not sufficiently consider the opinions of Didio's treating physicians and mental health providers. Therefore, remand is warranted. Accordingly, I **grant** Didio's motion and **deny** the Commissioner's.

**I.    Standard of Review**

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If

the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting

inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II. Facts

Anne Marie Didio applied for Social Security disability insurance benefits on April 22, 2014, alleging that she had been disabled since August 10, 2013. ALJ Decision, R. at 66. Didio filed her disability claim based on her history of bipolar disorder and bilateral knee replacements. *See* Disability Determination Explanation, R. at 155.

The SSA initially denied Didio's claim on August 4, 2014, finding that although Didio's "condition results in some limitations in [her] ability to perform work related activities . . . . We have determined that your condition is not severe enough to keep you from working." *Id.* at 165. In the agency's view, Didio was not disabled. *Id.* Didio sought reconsideration, but the SSA adhered to its initial decision on November 25, 2014. Disability Determination Explanation (Reconsideration), R. at 184.

Didio requested a hearing before an ALJ, which was held on February 4, 2016. Tr. of ALJ Hr'g, R. at 87. At the hearing, ALJ Matthew Kuperstein questioned Didio about her employment history, specifically asking her how much weight she lifted at various prior jobs,

3

what kinds of tasks her positions entailed, and her reasons for ever being terminated.[1] *Id.* at 100–01. Didio testified that due to her mental illness she has difficulty retaining employment. *Id.* at 102. "I can't work because I process my thoughts very slowly . . . . I can't multi-task, my concentration isn't that good, I jump from one thing to another [and] I can't focus on what I'm doing." *Id*. The ALJ also questioned Didio about her workout regime, her medications and their side effects, and her daily activities. *Id.* at 103–08. Didio acknowledged that she wants to work full-time but "[e]very time I try to get myself on the right track, it just falls apart on me." *Id.* at 105.

The ALJ then called a vocational expert, Jeffrey Joy. *Id.* at 115. The ALJ asked Joy to "assume a hypothetical individual" with Didio's past work history. *Id.* at 123. He asked Joy to further assume that the individual was limited to light exertional work "that involves only a frequent climbing of ramps or chairs, and only occasional climbing of ladders, ropes or scaffolds, kneeling, crouching or crawling." *Id*. "The individual would have a further limitation to, work that could be learned within 30 days and was [] of a routine or repetitive in nature." *Id*. The work would be limited to "a low demand environment without [] strict time or productivity requirements." *Id*. Finally, the work would not require "any constant, direct public contact, or [] team work. The individual would be eluded to work with supervisors and co-workers for routine work purposes where the interactions are [] brief and superficial." *Id*. at 124.

Joy opined that "an individual with these limitations" would not be able to perform work previously performed by Didio in the national economy. *Id*. Joy later stated however, that Didio could perform other "light exertional level" occupations under the same limitations described

---

[1] Didio testified that she worked as an intake clerk at FedEx from 2006 to 2012 but was terminated because she would routinely "make a lot of mistakes . . . com[e] in late, and not com[e] in at all to work because [of her] knees." ALJ Hr'g, R. at 101. Didio stated that she also worked as a mail handler for the US Postal Service and as a private security guard. *See id.* at 101–02, 117.

4

above. *Id.* Those occupations included "housekeeper, . . . mailroom clerk , . . .[or] a laundry and linen folder." *Id.*

Didio's counsel then examined the vocational expert. She asked Joy to consider a hypothetical person with the restrictions already provided by the ALJ, who also "about 50 percent of the time depending on the situation, is not able to carry out very simple instructions." *Id*. at 128. Joy testified that there would be no work for such a person in the national economy. *See id*.

On May 19, 2016, the ALJ issued an opinion in which he stated that "[a]fter considering the record as a whole, the undersigned is unable to find sufficient evidence to support [Didio's] allegations of disabling mental and physical impairments." ALJ Decision, R. at 72. Thus, Didio "ha[d] not been under a disability defined in the Social Security Act, from August 10, 2013, through the date of this decision." *Id.* at 80. At the first step, the ALJ found that Didio "ha[d] not engaged in substantial gainful activity since August 10, 2013, the alleged onset date." *Id.* at 68. At the second step, the ALJ found that Didio's "obesity, bipolar disorder; obsessive-compulsive disorder (OCD), and history of bilateral knee replacement" were "severe" impairments that "more than minimally affected [Didio's] ability to perform basic work-related activities."[2] *Id.* at 69. At the third step, the ALJ determined that Didio's impairments were not

---

[2] The ALJ ruled that Didio's general anxiety disorder ("GAD"), learning disorder, diabetes, and urinary incontinence were not severe impairments. ALJ Decision, R. at 69. Regarding Didio's GAD and learning disorder the ALJ noted that Didio "achieved a Full-Scale IQ score of 82 on the Wechsler Adult Intelligence Scale-Fourth Edition, which is in the upper end of the low average range." *Id.* In addition, the ALJ added that in Didio's most recent mental health visit prior to his decision, Didio's psychiatrist only assessed Didio as having bipolar disorder. *Id.* Regarding her diabetes, the ALJ stated that "treating sources have recommended nothing more than low cholesterol diet and exercise to manage this condition." *Id.* Finally, regarding Didio's urinary incontinence the ALJ noted that "the record indicates that [Didio's] incontinence improved when she was taking medication for this condition." *Id.* Therefore, the ALJ held that Didio's GAD, learning disorder, diabetes, and urinary incontinence "have caused no more than minimal functional limitations." *Id.*

5

per se disabling because Didio "d[id] not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments."[3] *Id.*

The ALJ then assessed Didio's residual functional capacity ("RFC"), and found that she could "perform light work . . . except that [she was] limited to frequent climbing of ramps or stairs, but no more than occasional climbing of ladders, ropes, or scaffolds, kneeling, crouching or crawling," and was "further limited to work that c[ould] be learned within 30 days and [was] routine and repetitive in nature." *Id.* at 71. In addition, she was limited to "to work that c[ould] be performed in a low demand environment without strict time or productivity requirements," and also limited to "work that does not require constant, direct public contact or teamwork, but she c[ould] have brief and superficial interactions with supervisors and coworkers for routine work purposes." *Id.* Lastly, the ALJ ruled that Didio was "limited to work that requires no more than minor work adjustments in a stable setting and routine." *Id.*

Although Didio's residual functional capacity rendered her "unable to perform any past relevant work," the ALJ determined that "[c]onsidering [Didio's] age, education, [and] work experience . . . there are jobs that exist in significant numbers in the national economy that [Didio] can perform," given her residual functional capacity. *Id*. at 78. Therefore, the ALJ ruled that Didio "ha[d] not been under a disability, as defined in the [SSA], from August 10, 2013, through the date of this decision." *Id.* at 80.

Didio requested a review of the ALJ's decision by the SSA's Appeals Council on May 27, 2016. Request for Review of Hearing Decision/Order, R. at 279. Finding that there was "no

---

[3] Regarding Didio's social functioning, the ALJ ruled that Didio had "moderate difficulties" noting that Didio's "behavior towards treating and examining mental health professionals has been described as cooperative, pleasant, friendly, and social. Further, [Didio] retains the ability to function in social settings, as she is able to use public transportation, go grocery shopping, attend church, go to the library and the movies, and hang out with friends." ALJ Decision, R. at 70.

6

reason . . . to review the [ALJ]'s decision," the Appeals Counsel "denied [Didio's] request for review" on July 27, 2017. Notice of Appeals Council Action, R. at 1. Didio filed a complaint with this Court on September 13, 2017, requesting that I reverse the Commissioner's decision, or remand for further administrative proceedings. *See* Compl., Doc. No. 1.

**III. Discussion**

On appeal, Didio contends that the ALJ's decision was not supported by substantial evidence. *See* Pl's Mot. to Reverse, Doc. No. 18-1, at 2. Specifically, Didio argues that ALJ Kuperstein failed to (1) "make proper the weight assignment to the opinions of [Didio's] numerous treating physicians and examining physicians, instead adopting the opinions of non-treating and non-examining state agency reviewers," and (2) "failed to properly determine [Didio's] Residual Functional Capacity in light of the limitations described by treating physicians, examining physicians, and even non-examining physicians." *Id.*

The Commissioner responds that the ALJ's decision "is supported by substantial evidence and complies with the applicable legal standards." Comm'r's Mot. to Affirm, Doc. No. 20-1, at 21.

A. <u>Did the ALJ fail to properly evaluate the medical opinion evidence and fail to properly determine Didio's residual functional capacity?</u>

Didio challenges the ALJ's treatment of the medical opinion evidence on two fronts. First, she argues that the ALJ did not assign any of Didio's treating physicians significant or controlling weight in violation of the "treating physician rule," which requires that the treating physicians' opinions be given substantial deference. Pl's Mot. to Reverse, Doc. No. 18-1, at 19. Second, she objects to the ALJ's decision to give "great weight" to the opinions of state agency consulting psychologists and physicians, who neither examined nor treated Didio. *Id.* at 30.

7

The Commissioner replies that the ALJ accorded proper weight to the medical opinion evidence. *See* Comm'r's Mot. to Affirm, Doc. No. 20-1, at 4–5.

Regarding the residual functional capacity determination, Didio argues that the ALJ's determination was not supported by substantial evidence because the finding "lacks impairments as described by [Didio] and treating sources and agency physicians." Pl's Mot. to Reverse, Doc. No. 18-1, at 32. Specifically, Didio asserts that the ALJ's finding did not make allowances for Didio's "slow movement resulting in off-take behavior," did not limit tasks to "single-step instructions," did not place additional limitations on Didio's exposure to "work-related stress," and should have limited [Didio] "to no interaction with co-workers." *See id.* at 32–37. In addition, Didio argues that the ALJ "should have limited [Didio] to sedentary work," and should have "limited [Didio] to less-than full time work." *Id.* at 37–38.

The Commissioner responds that the ALJ's residual functional capacity findings are "supported by substantial evidence." Comm'r's Mot. to Affirm, Doc. No. 20-1, at 21. For the reasons set forth below regarding the weight assigned to various medical experts, I agree with Didio, and therefore remand the case regarding the ALJ's residual functional capacity findings.

1. *Evaluation of Medical Opinion Evidence*

"The treating physician rule provides that an ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[4] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order)

---

[4] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

(quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008).

The Second Circuit has held that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Id.* at 128. For example, an expert's opinion is "not substantial, i.e., not reasonably capable of supporting the conclusion that the claimant could work where the expert addressed only deficits of which the claimant was not complaining, or where the expert was a consulting physician who did not examine the claimant and relied entirely on an evaluation by a non-physician reporting inconsistent results." *Id.* (internal citations and quotations omitted).

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Didio's treating physicians. *See Burgess*, 537 F.3d at 129.

9

In his decision, the ALJ afforded "great weight" to the opinions of two state agency consultants whose opinions were more "consistent" with the entire record, than the opinions of Didio's treating psychologist, treating psychiatrist, and other mental healthcare providers. *See* ALJ Decision, R. at 75. Regarding Didio's mental RFC, the ALJ gave "great weight" to state agency consultant Dr. Pamela Fadakar who opined that Didio had moderate restrictions in her activities of daily living; moderate restrictions in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and experienced no episodes of decompensation."[5] *See id.*; Disability Determination Explanation (Reconsideration), R. at 177. Regarding Didio's physical RFC, the ALJ gave "great weight" to the November 2014 opinion of state agency consultant Dr. Khurshid Khan, who reviewed the evidence in the record and opined that Didio could do light work.[6] ALJ Decision, R. at 76.; Disability Determination Explanation (Reconsideration), R. at 177–78.

Didio's treating physicians expressed a more severe evaluation of her mental impairments. Didio's treating psychologist, Dr. Katie Carhart opined in December 2014 that Didio had a "frequent [] problem or limited ability" to (1) use the appropriate coping skills; (2) handle frustration appropriately; (3) interact appropriately with others; (4) get along with others without distracting them; (5) carry out multi-step instructions; (6) focus long enough to finish

---

[5] Dr. Fadakar concluded that Didio had "[s]ome cognitive slowing secondary to meds with related low CPP [concentration, persistence and pace] tolerance but retain[ed] ability to maintain attention necessary to complete simple rrts [routine repetitive tasks] during a [normal] work day/[week] in a low demand environment. [Didio] c[ould] follow a set schedule and make simple work-related decisions." Disability Determination Explanation (Reconsideration), R. at 181. The Commissioner asserts that Dr. Fadakar's opinion was similar to state agency psychologist Dr. Warren Leib, who opined on June 26, 2014 that Didio had no restriction of activities of daily living, a mild restriction in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace. Comm'r's Mot. to Affirm, Doc. No. 20-1, at 4 (referencing Disability Determination Explanation (Initial), R. at 163).
[6] The ALJ noted that Dr. Khan's opinion was "consistent" with other medical evidence received at the hearing level, which revealed that Didio had "generally retained normal range of motion, despite some pain complaints. Further, the discomfort in her knees improved with physical therapy." ALJ Decision, R. at 76.

simple tasks or activities; (7) change from one simple task to another; (8) perform basic activities at a reasonable pace; (9) and persist in simple activities without interruptions from psychological symptoms.  Dr. Carhart 2014 Mental Assessment, R. at 697–98.  In January 2016, Dr. Carhart opined that Didio had "poor or no[]" ability to (1) maintain attention for a two-hour segment, (2) accept instructions and respond appropriately to criticisms from supervisors, and (3) get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes.  Dr. Carhart 2016 Mental Assessment, R. at 973.

Didio's treating psychiatrist, Dr. Keith Lepp opined in May 2014 that Didio had a "very serious" problem performing work activity on a sustained basis, eight hours per day, five days per week.  Dr. Lebb May 2014 Mental Assessment, R. at 527, 532.  In addition, Dr. Lebb noted that Didio's had a "slight" to "obvious problem" with (1) handling frustration appropriately, (2) getting along with others without distracting them or exhibiting behavioral extremes, (3) carrying out multi-step instructions, (4) focusing long enough to finish assigned simple activities or tasks, and (5) performing basic work activities at a reasonable pace.  *Id.* at 527–28, 532.  In November 2014, Dr. Lebb completed an additional assessment, where he noted that Didio's had a "frequent" or "limited ability" to (1) handle frustration appropriately, (2) interact appropriately with others, (3) respect appropriately to others in authority, (4) get along with others without distracting them or exhibiting behavioral extremes, (5) carry out multi-step instructions, (6) perform basic work activities at a reasonable pace, and (7) persist in simple activities without interruption from psychological symptoms.  Dr. Lebb November 2014 Mental Assessment, R. at 685–94.

Didio's psychological examiner, Dr. Jeffrey Cohen, stated in November 2014 that Didio had "[i]mpairments in [her] concentration, [and] at times her mood c[ould] be extremely labile."

Dr. Cohen 2014 Disability Evaluation, R. at 669. Dr. Cohen concluded that Didio's "memory and her history of mental illness []interfere[d] in her overall functioning." *Id.*

In 2015, Didio underwent a psychological assessment with Dr. Louis Amato, in which she achieved a full-scale IQ of 82 (12th percentile) and a working memory index score of 80 (10th percentile). Dr. Amato 2015 Mental Assessment, R. at 708–09. Dr. Amato opined that "[a]lthough she strives to be more organized, [Didio] does not have the discipline and structure to manage her day. Consequently she is essentially house bound." *Id*. at 712. Moreover, Didio "process[ed] information slowly" and demonstrated organizational difficulties, emotional difficulties, and memory deficits. *Id*.

Finally, Didio's treating social worker, Angela Hay, opined that Didio "is unable to maintain any gainful employment due to the combination of physical, mental and cognitive impairments." Hay 2016 Report, R. at 977.

In his decision, the ALJ gave "little weight" to Dr. Carhart's December 2014 assessment because Dr. Carhart "had a limited treatment history with [Didio] at the time, as she had only been treating [Didio] for 2 months." ALJ Decision, R. at 76. Moreover, "[Dr. Carhart's] opinion is not entirely consistent with her treatment notes or Dr. Cohen's examination reports . . . which indicated that [Didio] was cooperative with intact thought content, average fund of knowledge and only mild concentration problems, minimal impairment in judgment and insight." *Id*. Regarding Dr. Carhart's January 2016 mental assessment, the ALJ assigned "some weight" to the opinion that Didio "had good to fair ability to carry out and remember simple short instruction, make simple work related decisions, sustain [an ordinary] routine without special supervision, interact appropriately with the public and maintain socially appropriate behavior." *Id.* (referencing Dr. Carhart 2016 Mental Assessment, R. at 972–76). However, the ALJ

assigned "less weight" to Dr. Carhart's opinion that Didio had a poor ability to maintain attention for two-hour segments because she "provided no explanation for this problem" and because her opinion was "likely based" on Didio's subjective report of "holding 25 jobs in the past 15 years."[7] *Id*. Additionally, the ALJ noted that Didio's limited ability to get along with co-workers was accommodated by limiting her to work that does not require "constant, direct public contact or teamwork, and no more than brief and superficial interactions with supervisors and coworkers." *Id.*

Regarding Dr. Lepp's November 2014 evaluation, the ALJ assigned "little weight" to Dr. Lepp's opinions regarding Didio's daily living activities and her social interactions because they "d[id] not correlate to any particular question on the assessment." *Id*. at 77. In addition, "Dr. Lepp's opinion that [Didio] could not perform work activity on a regular and sustained basis is not well supported by the record." *Id.*

The ALJ also assigned "little weight" to Dr. Cohen's 2014 opinion that Didio's mood could be extremely labile, and that her mental illness interfered with her overall functioning. *Id.* The ALJ stated that Dr. Cohen's assessment was "broad at best" and "was based on his one time consultation with [Didio], and appears to be based mostly on [Didio's] subjective reports [of] multiple terminations, argumentativeness and psychiatric hospitalizations in the past." *Id*. Furthermore, Dr. Cohen did not indicate any specific limitation associated with Didio's mental impairments. *Id.*

The ALJ gave "no weight" to Dr. Amato's 2015 mental assessment, where he opined that Didio's emotional difficulties and cognitive deficits impaired her ability to work full time. *Id*. The ALJ found that Dr. Amato "appeared to base his opinion on [Didio's] reported symptoms of

---

[7] Didio's Detailed Earning Query shows Didio having eleven employers in the past fifteen years. *See* Detailed Earning Query, R. at 299–300.

13

social isolation and poor coping skills that are not 'not inconsistent' with his examination notes and the examination notes of other treatment providers." *Id*. The ALJ also noted that Dr. Amato's own examination notes indicated that Didio was "pleasant, friendly and social during her evaluation" and his opinion was inconsistent with Didio's reports of going to church, the library, and the movies. *Id*. (referencing Dr. Amato 2015 Mental Assessment, R. at 707).

Finally, the ALJ gave "no weight" to Angela Hay's 2016 Report, which concluded that Didio was unable to maintain gainful employment due to her physical and mental impairments. *Id*. The ALJ stated that Ms. Hay "is a social worker, not an acceptable medical source" *Id.* (referencing SSR 06-3p).[8] In addition, the ALJ found that Ms. Hay's opinion was not consistent with Didio's medical history, which showed "no more than moderate symptoms, from which [Didio] endorsed improvement with increased activity." *Id.*

In this case, I find that the ALJ did not provide sufficiently "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Didio's treating physicians. *See Burgess*, 537 F.3d at 129. Although ALJ Kuperstein stated that Didio's physicians' opinions were "not well supported by the record," nor consistent with "the examination notes of other treatment providers," he did not cite to any specific medical records to support that finding. *See* ALJ Decision, R. at 77. The ALJ gave also "great weight" to state agency consultants who neither treated nor examined Didio. *See id.* Ironically, Dr. Carhart's 2014 assessment was given "little weight" because "she had a limited treatment history with [Didio] at the time, as she had only been treating [Didio] for 2 months." *Id*. at 76. Dr. Cohen,

---

[8] Under SSR 06-03p (rescinded Mar. 27, 2017), a licensed clinical social worker was not an "acceptable medical source." However, licensed clinical social workers were listed as "other sources" used to establish the existence of an impairment. SSR 06-03p was rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, which revised the medical source rules for claims filed on or before March 27, 2017. Under the revised rule, all medical sources, not just acceptable medical sources, can provide evidence that the SSA categorizes and considers medical opinion. Because Didio filed her claim before March 27, 2017, her claim was filed before the revised rule was in effect.

Didio's psychological examiner, was given "little weight" because his assessment was "based on his one time consultation with [Didio]." *Id.* at 77. Yet, Dr. Fadakar and Dr. Khan, whose opinions were both given "great weight," have *no* treatment history with Didio and have *never* performed an in-person consultation with Didio.

In addition, Dr. Fadakar and Dr. Khan based their opinions on an incomplete medical record. Both Dr. Fadakar and Dr. Khan made their determinations reviewing evidence in the record up to November 2014. *See* Comm'r's Mot. to Affirm, Doc. No. 20-1, at 5, 19. The ALJ made his decision in May 2016, nearly a year and a half later. *See* ALJ Decision, R. at 81. Thus, the state agency reviewers did not consider Dr. Carhart's December 2014 Mental Assessment (R. 696–706), Dr. Carhart's 2016 Mental Assessment (R. at 972–76), Ms. Hay's 2016 Report (R. at 977), or Dr. Amato 2015 Mental Assessment (R. at 707–14).

I also conclude that ALJ Kuperstein did not properly evaluate the persuasiveness of Angela Hay's opinion under the factors listed in 20 C.F.R. § 404.1527(c)(2)–(6). The ALJ was not sufficiently specific when he gave "no weight" to Ms. Hay's 2016 Report, stating that Didio's "mental health record reflects no more than moderate symptoms . . . contrary to Ms. Hay's opinion." ALJ Decision, R. at 77.

For the reasons stated above, I remand the ALJ's decision for further consideration of the opinions of Didio's treating physicians and mental health providers.

2. *Residual Functional Capacity Determination*

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The

15

ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] . . . finding that [is] consistent with the record as a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In making a residual functional capacity determination in the present case, ALJ Kuperstein noted that Didio "has been described as pleasant and cooperative with good insight, goal directed thoughts, average fund of knowledge, and the ability to do simple tasks such as performing simple math and making change." ALJ Decision, R. at 73. Therefore, the ALJ found that Didio "retain[ed] the ability to perform routine and repetitive work that can be learned within 30 days and can be performed in a low demand environment without strict time or productivity requirements." *Id.* The ALJ further limited Didio to work "that does not require constant, direct public contact or teamwork, but she can have brief and superficial interactions with supervisors and coworkers for routine work purposes. Lastly, she [was] limited to work that requires no more than minor work adjustments in a stable setting and routine." *Id.*

In crafting those limitations, the ALJ did not rely on substantial evidence. Although ALJ Kuperstein stated that the record contains "objective findings of mild concentration problems and difficulty with multi-step tasks," Didio's treating physicians provided a more acute view of Didio's mental limitations. *See id*.

Thus, the case is remanded for further consideration of Didio's residual functional capacity.

## IV. Conclusion

For the reasons stated, I **deny** the Commissioner's motion to affirm, and **grant** Didio's motion to reverse to the extent that it asks that I vacate the decision of the Commissioner. I remand for further development of the record and consideration of the weight to be accorded the various medical opinions provided to the ALJ, consistent with the foregoing reasoning. The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, that Social Security appeal shall be assigned to me (as the District Judge who issued the ruling that remanded the case).

So ordered

Dated at Bridgeport, Connecticut, this 26th day of March 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge